FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 MAY 17 PM 3: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

DARRY L. PILKINGTON,

    Plaintiff,

v.

HOOVER CITY BOARD OF EDUCATION,

    Defendant.

)
)
)
)
)
)
)
)
)
)

ENTERED

MAY 1 7 2004

CIVIL ACTION NO. 01-PWG-2815-S

## MEMORANDUM OF OPINION

Darry L. Pilkington, plaintiff herein, filed this action against the Hoover City Board of Education alleging violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. (ADA) and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. (ADEA) and breach of contract.   The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.

This matter is before the court on defendant's motion for summary judgment (doc. #14).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure.*  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See*

25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The following pertinent facts are undisputed or, if disputed, viewed in the light most favorable to plaintiff, the non-moving party. Darry L. Pilkington was hired in June 1988 by the Hoover City Board of Education to be the director of bands which included being director of high school and middle school bands. In 1988, the Hoover School system at that time had one high school, Berry High School, and one middle school, Simmons Middle School. A.B. Baggett was on the band staff. He was moved from Simmons Middle School to Berry High School as an assistant band director. Dennis Carroll was hired as band director at Simmons Middle School.

Although Mr. Pilkington suffered from diabetes, narcolepsy, congestive heart failure, low blood pressure, and arthritis and takes medicine for all of these conditions, (Pilkington depo. pp. 44-

47, 223) his health did not hinder or limit his ability to perform his duties as high school band director. (Pilkington depo. pp. 47, 105). In 1996, Mr. Pilkington told Superintendent Bumpus that he wanted a less demanding position. He later met with Dr. Farr, then Assistant Superintendent and incoming Superintendent of the Board, and Dr. Connie Williams. They discussed a transfer for Mr. Pilkington from his position as Director of Bands to Music Supervisor for the middle school bands. By 1996, the system had two middle schools, Simmons Middle School and Berry Middle School. (Pilkington depo. p. 54). Mr. Pilkington told Dr. Farr and Dr. Williams "my salary could not diminish if I made a move, and at that time I wanted it to be something that had some dignity to the move. If I was going, I wasn't going just as a band director." (Pilkington depo. p. 58). It was agreed at a later meeting that the salary would not decrease. (Pilkington depo. p. 65). Mr. Pilkington further testified in deposition that

> originally Dr. Farr talked in terms of two years, and I said, no, I would do it for two years, I wanted four years meaning that I'd be at the age of 62 at the time, meaning I could if I wanted to retire or could not if I wanted to retire. It would be within my framework to make that decision but it would give me those four years to make arrangements.
> ....

> Q.  Did you indicate to either Dr. Farr or Dr. Bumpus what your intent was in four years, whether you were going to retire or not?

> A.  I said I hoped to retire, yes. I did say I hoped to retire in a dignified fashion.

(Pilkington depo. pp. 65-66).

As supervisor of the middle school bands, Pilkington was to assume the following duties:

> I would supervise all middle school bands and band directors, and I would work with all the bands, all the middle school bands. That was I would teach some bands, I would supervise some, but I would be in charge of feeding – working out the feeder program.

> I would be responsible for making that program, come
> out as the high school band director wanted it to be.
> In other words, I wouldn't be doing one program here
> and him wanting something else. I would make sure
> that what we did here matched what he needed at the
> high school, and then at the time I worked in each one
> of the middle schools I would be reporting to
> whichever principal I worked under in those middle
> schools.

(Pilkington depo. 67).

The position of supervisor of the middle schools was considered by both parties to be a one time

position. (Pilkington depo. p. 68). Prior to 1996, the middle school band directors reported to

Pilkington as the director of bands. (Pilkington depo. pp. 68-71, 95).

The Board granted Mr. Pilkington's request for a transfer. He was transferred from his

position as high school band director to middle school band director on or about April 29, 1996.

(Defendant's Exhibits 3 & 4). Originally, Mr. Pilkington was to be assigned to Berry Middle

School. (Defendant's Exhibit 3). Ultimately, however, he was assigned to Simmons Middle School

after he assisted in transferring A.B. Baggett to Berry Middle School before leaving his high school

band director position.  (Pilkington depo. pp. 55, 195, Defendant's Exhibit 5)  .

In September 1998, the legislature granted teachers an 8.5% pay raise; however,  Mr.

Pilkington did not receive this raise until one year later when the raise was made retroactive. On

May 5, 2000, Pilkington received his first disciplinary "write up" in forty-three years. He was

charged with failing to follow procedure before leaving campus. Mr. Pilkington left campus to drive

himself to his doctor's office  because he was experiencing chest pains. After this reprimand,

Pilkington observed nine employees younger from his own age leave campus without recording their

names in the sign-out book and without being written up. In the Spring of 2000,  Principal Carol

Barber informed Mr. Pilkington that he was to be the band director at Simmons Middle School. In the Spring of 2000, Mr. Pilkington's request for a microphone for use during a concert was denied because he had not attended a clinic on the use of the microphone while Ms. White was allowed to use the microphone even though she had not attended a clinic either. In June 2000, Principal Barber wrote plaintiff a letter confirming his assignment for the 2000-01 school year which states in pertinent part:

> The last personnel action for you was verified in a letter to you dated August 30, 1996 ... This personnel action informed you of the transfer from band at Berry Middle School to band at Simmons Middle School effective for the 1996-97 school year. Beginning with the 2000-2001 school year, you will be teaching five band classes at Simmons Middle School. These classes will be comprised of students from grades 6, 7 & 8 at Simmons Middle School who have selected to take band as their elective course.

(Exhibit to Plaintiff's Exhibit 3).

When he was deposed in December 2002, Pilkington stated that he was employed as the director at Play It Again Alabama where he worked 40 hours a week. (Plaintiff's depo, pp. 22-23.). He testified that he walked approximately a mile a day in this position, that his walking including climbing stairs and moving musical instruments. (Plaintiff's depo, pp. 30-31). He further testified that he did not require any accommodation to perform his duties at Play it Again Alabama. (Plaintiff's depo, p. 48).

I. ADA claim

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement,

or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

The burden shifting analysis applicable to a Title VII action controls an ADA claim. *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). To establish a *prima facie* case of discrimination based upon disability, a plaintiff must prove that he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of his disability. *Id.*

Disability is defined as follows:

> The term "disability" means, with respect to an individual –
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. Section 12102(2).

Mr. Pilkington argues that he is disabled because he has multiple disabilities which require medication, that his diabetes has caused his bones to deteriorate, and the bones in his right foot began cracking when he was employed as music supervisor of the middle schools necessitating surgeries and the placement of his right foot in a specially made cast.

There is no dispute that Pilkington's medical conditions, which include diabetes, narcolepsy, congestive heart failure, low blood pressure, and arthritis, amount to physical impairments. "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002). "[I]f a person is taking measures to correct for, or mitigate, a physical ... impairment, the effects of those measures–both

positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999). The United States Supreme Court has elaborated on the requirements of "substantially limits" and "major life activities" necessary for one to be disabled for purposes of the ADA:

> Our consideration of this issue is guided first and foremost by the words of the disability definition itself. "[S]ubstantially" in the phrase "substantially limits" suggests "considerable" or "to a large degree. See *Webster's Third New International Dictionary* 2280 (1976) (defining "substantially" as "in a substantial manner" and "substantial" as "considerable in amount, value, or worth" and "being that specified to a large degree on in the main"); see also 17 *Oxford English Dictionary* 66-67 (2d ed. 1989) ("substantial": "[r]elating to or proceeding form the essence of a thing; essential"; "[o]f ample or considerable amount, quantity or dimensions"). The word "substantial" thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities. Cf. *Albertson's, Inc. v. Kirkingburg*, 527 U.S., at 565, 119 S.Ct. 2162 (explaining that a "mere difference" does not amount to a "significant restric[tion]" and therefore does not satisfy the EEOC's interpretation of "substantially limits").
>
> "Major" in the phrase "major life activities" means important. See *Webster's, supra*, at 1363 (defining "major" as "greater in dignity, rank, importance, or interest"). "Major life activities" means important. See *Webster's, supra*, at 1363 (defining "major" as "greater in dignity, rank, importance, or interest"). "Major life activities" thus refers to those activities that are of central importance or daily life. In order for performing manual tasks to fit into this category – a category that includes such basic abilities as walking, seeing, and hearing – the manual tasks in question must be central to daily life. If each of the

> tasks included in the major life activity of performing
> manual tasks does not independently qualify as  a
> major life activity, then together they must do so.

*Toyota Motor Manufacturing, Kentucky, Inc.*, 534 U.S. 184, 196-97 (2002).

The court further recognized that disability is determined on a case by case method:

> It is insufficient for individuals attempting to prove
> disability status under this test to merely submit
> evidence of a medical diagnosis of an impairment
> Instead, the ADA requires those "claiming the Act's
> protection ... to prove a disability by offering
> evidence that the extent of the limitation [caused by
> their impairment] in terms of their own experience ...
> is substantial." *Albertson, Inc. v. Kirkingburg, supra,*
> at 567, 119 S.Ct. 2162.

*Supra,* 534 U.S. at 198.

Although Mr. Pilkington suffers from a myriad of health problems, these conditions do not

substantially limit  a major life activity as made clear by his deposition testimony:

> Q.   In your day-to-day activities, do these conditions limit your ability to do
> anything?
>
> A.   No.
>
> Q.   Other than taking – having to take medications, are there any restrictions that
> are imposed on you by  your doctors because of any of these conditions?
>
> A.   Well, I don't – I'm not going to run a race today, and I'm not going to climb
> a whole lot of steps to the Empire state building.  Those are the main ones
> right now as far as my old frame not being able to – my bones are not able
> to carry me that far.  Other than that, I'm fine.

(Plaintiff's depo. at 47-48).

Mr. Pilkington has, moreover, denied that his medical conditions hinder performance of his

employment duties.  (Plaintiff's depo. at 105).  In his subsequent role as director of Play It Again,

he testified that he did not require accommodation even though in that position he walked approximate one mile a day, climbed stairs and moved musical instruments.

Mr. Pilkington has failed to show that he is substantially limited in performing major life activities. He cannot carry his burden of establishing that he is disabled within the meaning of the ADA. The first element of a *prima facie* ADA claim has not been satisfied. The court need not address whether Mr. Pilkington was qualified nor whether he was subjected to unlawful discrimination based on his disability.

To the extent that Mr. Pilkington alleges that he was demoted and that the demotion was based upon his disability, the claim cannot have merit in light of the fact that he has failed to prove that he is disabled within the meaning of the statute.

II. <u>ADEA Claim</u>

In order to establish a *prima facie* case of age discrimination, the plaintiff must show: "(1) that [he] was a member of the protected group of persons between the ages of forty and seventy; (2) that [he] was subject to adverse employment act; (3) that a substantially younger person filled the position; and (4) that [he] was qualified to do the job [from which he was discharged]." *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1346 (11th Cir. 2000), quoting *Bogle v. Orange County Board of Commissioners*, 162 F.3d 653, 656-57 (11th Cir. 1998) and *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.), *cert. denied,* 525 U.S. 962 (1998). The Board argues that Mr. Pilkington did not suffer from an adverse employment action. Pilkington's position is that he suffered an adverse employment action when he was given a written reprimand for leaving campus when he believed he was having a heart attack. He further argues that after he had been disciplined

he had observed nine individuals (only seven of whom are identified) younger than him leave without signing out.

Mr. Pilkington also argues that he suffered an adverse employment action when he was demoted from music supervisor to band director upon notification by Ms. Barber that he would be the band director at Simmons Middle School.  Pilkington further states, however, that even prior to this notification he had been treated as though he was a band director rather than a music supervisor because he was the only member of the band department required to teach a non-band class and several band classes.  (Plaintiff's brief, p. 26).

The standard by which it is determined whether a plaintiff has suffered an adverse employment action is the same in an action under Title VII, the ADA and the ADEA.  Whether a reasonable person in the plaintiff's position  would view the employment action in question as adverse.  *Doe v. Dekalb County School District*, 145 F.3d 1441 (11th Cir. 1998).  "To prove adverse employment actions ..., an employee must show a serious and material change in the terms, conditions, or privileges of employment."  *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232 (11th Cir. 2001).  In *Davis*, the court held that a negative job performance memoranda placed in the plaintiff's file did not constitute an adverse employment action because the plaintiff "did not suffer any tangible consequence from this memoranda, in the form of a loss of pay or benefits or further discipline."  245 F.3d at 1240.

With respect to both the reprimand and the alleged demotion, Pilkington, like the plaintiff in *Davis*, complains of loss of prestige or self-esteem or dignity.  The Eleventh Circuit has held that such proof will rarely establish the adverse action required to pursue a claim under Title VII's anti-discrimination clause.  This would apply equally to Mr. Pilkington's ADEA claims.

10

The record establishes there is an apparent disparity between the "official" job title reflected on the personnel action forms and the "unofficial" job titles used on a daily basis. While plaintiff was hired in 1988 in the new position as "Director of Bands," it appears that the "official" title had been "band director." The April 29, 1996 personnel action form indicates that Mr. Pilkington's transfer was to "middle schools/band director" and that he was moving "From Band Director at HHS." (Exhibit to Plaintiff's exhibit 3). On August 29, 1996, another personnel action form indicates that Mr. Pilkington was transferring to "SMS/Tchr" of Band from "Band at BMS."[1] "Music supervisor" of the middle schools was not an official title.

Mr. Pilkington acknowledged that there was no position of "music supervisor" prior to 1996, that he never saw a job description for music supervisor. He further acknowledges the duties he was to perform as music supervisor had been among the duties he previously performed as director of bands. He also acknowledges that the music supervisor position was a one time position.

Connie Williams, Assistant Superintendent for Human Resources and Administration, testified that there was not a report sent to the State Department of Education that listed Mr. Pilkington as a supervisor because "if we had done that, we would then have received something that said, 'He can't do this. He doesn't have certification to be a supervisor.'" (Williams depo., p.39).

To the extent that Mr. Pilkington alleges he was the only member of the band department required to teach a non-band class and more than two band classes, it is relevant the band department at Simmons had only one other member, Sallie White. White was at Simmons for two periods a day while Mr. Pilkington was at Simmons full-time. (Barber, p.33). Plaintiff acknowledged that A. B.

---

[1] According to the deposition testimony of both Connie Williams (depo., pp.43-44) and Carol Barber (depo., p.26), a band director is a teacher of band; therefore, the August 29, 1996 form does not reflect a demotion.

Baggett, the band director at Berry Middle School, also taught a non-band class (health) the year after plaintiff taught the same class.  (Pilkington depo., pp.110-11).

Principal Barber testified that Mr. Pilkington's duties and responsibilities as a band director changed in 2000 in the following respects:

> A:   Up until that point in time, we had – we had one – basically one and a half, maybe one and two-thirds band directors at Simmons.  Because our numbers didn't warrant that extra part-time position that we shared with the Hoover High School, Mr. Pilkington was being assigned all of the band responsibilities at Simmons.  It wasn't a change as much as it was – it wasn't a change in terms of his assignment for teaching.  He was just going to be the sole person who was going to be responsible for teaching and working with our entire band program.

> Q:   When you said "to meet part-time," what did you mean by that?  I'm sorry. I didn't understand.

> A:   Ms. White was part-time Simmons, part-time Hoover High.  She wasn't teaching the full day at Simmons.  She taught part of the day at Simmons and part of the day at Hoover High School.  And she was transferred to Hoover High School full-time because our numbers didn't warrant one and a half teachers.  It only warranted one full-time person.  So, Mr. Pilkington was going to be taking the entire band program at our school, when in the past he had had – he had shared whose responsibilities with Ms. White.

> Q:   So, you're saying that Ms. White actually completely transferred over to Hoover and was no longer at Simmons/

> A:   Yes.  That's correct.

> Q:   Do you recall how many classes Mr. Pilkington was having to teach during that time period?

> A:   During that time period?

> Q:   Yes, ma'am.

> A:   He had on his schedule four classes.

> Q:   Now, was this prior to the time that he was being transferred or had to assume all of the responsibilities?

12

A:   Okay.  I'm not aware that he was transferred.  When he was at Simmons as a full-time or as a band director –

Q:   Excuse me.  When his duties and responsibilities changed.  I'm sorry.

A:   He had four classes and then he was going to have to pick up the fifth class.

Q:   Was that normal for a band teacher to have those many classes?

A:   All of our teachers at Simmons have five full-time teaching responsibilities.

Q:   Including band directors?

A:   Yes, ma'am.

Q:   Was that the very first time that that was ever initiated or had a band teacher taught five classes prior to that time?

A:   I don't understand your question.

Q:   Okay.  I'm sorry.

Do you know whether or not a band teacher was required to teach five classes prior to the time that Mr. Pilkington was assigned to teach five classes?

A:   I never had just – until Mr. Pilkington was being assigned, I was not – I never had a full-time band teacher.  I always shared a band teacher with another school.  Now, it equated to five classes and part of that is based on numbers also, the number of kids who enroll.

In terms of a class load, a full-time person would teach five classes.  That's what all of the teachers at my school with the current schedule we're running teach.  And at that time when Mr. Pilkington – when Mr. Pilkington retired, all teachers were teaching five full classes through the school day.

And the way our schedule ran and the numbers of kids we had enrolled for band, entitled us to one full-time teaching position.

Mr. [sic] White did not teach five full classes because she was only there part-time.

(Bonner, pp.32-36).

13

When Mr. Pilkington transferred from Hoover High School as band director to the middle schools as band director, plaintiff's official  title of "band director" was not changed, his pay remained the same, and his responsibilities were reduced.  Likewise, in 2000 when plaintiff alleges he was demoted from music supervisor to band director, his "official" title remained the same, his pay remained the same, as did his responsibilities.  Mr. Pilkington testified that in his first year as music supervisor, he taught six band classes.  In his second year he taught five band classes and one non-band class.  The number of classes he was to assume in 2000-2001 did not increase.

Mr. Pilkington did not suffer a tangible consequence from either the reprimand or the fact that Mr. Barber referred to him as Band Director of Simmons.  Plaintiff's ADEA claims are not cognizable because of his to demonstrate an adverse employment action.

Breach of contract claim

In *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665 (Ala. 2001), the Alabama Supreme Court stated:

> The elements of a breach-of-contract claim are: (1) the existence of a valid contract binding upon the parties in the action, (2) the plaintiff's own performance; (3) the defendant's nonperformance, or breach, and (4) damage. ... The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement.

817 So.2d at 673.

Mr. Pilkington argues that he and Dr. Farr negotiated a position, memorialized in writing, for him to be a music supervisor of all middle school bands.  He claims that the contract was breached when he was demoted and  required to work as a band director at a single school, was

asked to teach non-band classes and was made junior to people he believed he was to have supervised.

On April 10, 1996, Dr. Jack Farr sent the following memorandum to plaintiff:

> TO:        Mr. Darry Pilkington, Band Director
>
> FROM:      Dr. Jack Farr, Associate Superintendent
>
> RE:        Items Involved In Request to Change From High School Level to Middle School Level Band
>
> 1.   Mr. Pilkington will submit a letter to the superintendent and the board asking to be transferred to the middle school program as head of the middle school band programs.
>
>      In this role he will report to and be directly responsible to the middle school principals.  He will coordinate the middle school and program at the discretion and under the direction of the high school band director.
>
>      He will be responsible for giving direction and supervision to all middle school bands and band directors.  He will work with and instruct middle school students in all areas of instrumental music.
>
> 2.   Mr. Pilkington will enter this position at his 1995-1996 salary for a minimum of two years and a maximum of four years.  Prior to the end of the 1997-1998 school year, Mr. Pilkington, the middle school principals, the high school band director, and the superintendent will revisit this agreement to determine future needs and responsibilities.

(See plaintiff's exhibit 6).

The memorandum does not state the title of the position that Mr. Pilkington is to hold in the middle school program. The memorandum is addressed to "Mr. Darry Pilkington, Band Director" even though Pilkington maintains that he was Director of Bands. The April 10, 1996 memorandum does not state the duration of the alleged contract although it implies that, to the extent there is a contract, such contract would be limited to four years but would be subject to revision after three years. The memorandum indicated that the salary would remain at plaintiff's "1995-1996 salary;"

however, Pilkington argued later that he should be entitled to the 8.5% across-the-board teacher pay raise approved in 1998 even though that was not provided for in the memorandum.  Mr. Pilkington refers to an "agreement letter" in his July 12, 2000 correspondence to Dr. Farr.  (Document #14, Exhibit 6).  The plaintiff has never identified any document to be the "agreement letter" other than the April 14, 1996 letter.

Because the alleged contract did not specifically address matters of critical importance such as the title of the position, the contract duration,  whether his salary would be affected by across the board pay increases, and whether the Mr. Pilkington was required to retire at the end of four years, the court concludes that there was no mutual assent critical to a finding of a contract.

The Hoover City Board of Education motion for summary judgment (doc. #14) is due to be granted.  A separate Final Judgment will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the ___17th___ day of May, 2004.


PAUL W. GREENE
CHIEF MAGISTRATE JUDGE

16